987 A.2d 575

ROBERT NICASTRO AND ROSEANN NICASTRO, H/W, PLAIN-TIFFS–RESPONDENTS, v. MCINTYRE MACHINERY AMER-ICA, LTD., DEFENDANT, AND J. MCINTYRE MACHINERY LTD., DEFENDANT–APPELLANT.

Argued January 21, 2009—Decided February 2, 2010.

Hoens, J., dissented and filed opinion in which Rivera-Soto, J., joined.

Rivera–Soto, dissented and filed opinion.

50

*Steven F. Gooby,* argued the cause for appellant (*Ansa Assuncao,* attorneys; *Mr. Gooby* and *James S. Coons,* on the briefs).

*Alexander W. Ross, Jr.,* argued the cause for respondents (*Rakoski & Ross,* attorneys; *Mr. Ross* and *Janice L. Heinold,* on the brief).

*Jonathan W. Miller*, argued the cause for *amicus curiae* Association of Trial Lawyers-New Jersey (*Locks Law Firm*, attorneys; *Mr. Miller* and *Michael A. Galpern*, on the brief).

Justice ALBIN delivered the opinion of the Court.

Today, all the world is a market. In our contemporary international economy, trade knows few boundaries, and it is now commonplace that dangerous products will find their way, through purposeful marketing, to our nation's shores and into our State. The question before us is whether the jurisdictional law of this State will reflect this new reality.

In this case, the foreign manufacturer of an allegedly defective and dangerous industrial machine targeted the United States economy for the sale of its product. The machine was sold to a New Jersey business by the manufacturer's exclusive American distributor. An employee of that New Jersey business lost several fingers while using the machine because the machine allegedly lacked a safety guard. The foreign manufacturer knew or reasonably should have known that by placing a product in the stream of commerce through a distribution scheme that targeted a fifty-state market the product might be purchased by a New Jersey consumer. We must resolve whether under those circumstances the manufacturer is subject to the jurisdiction of our State court system in a product-liability action.

We affirm the Appellate Division, which found the New Jersey Superior Court, Law Division, as the proper forum for this action. We also reaffirm our decision in *Charles Gendler & Co. v. Telecom Equipment Corp.*, in which we held that "the stream-of-commerce theory supports the exercise of jurisdiction if the manufacturer knew or reasonably should have known of the distribution system through which its products were being sold in the forum state." 102 *N.J.* 460, 480, 508 *A.*2d 1127 (1986). The increasingly fast-paced globalization of the world economy has removed national borders as barriers to trade and has proven the wisdom of *Charles Gendler*. Due process permits this State to

provide a judicial forum for its citizens who are injured by dangerous and defective products placed in the stream of commerce by a foreign manufacturer that has targeted a geographical market that includes New Jersey. *See id.* at 480–83, 508 *A.*2d 1127. The exercise of jurisdiction in this case comports with traditional notions of fair play and substantial justice.

## I.

### A.

On October 11, 2001, plaintiff Robert Nicastro, an employee for thirty years of Curcio Scrap Metal, was operating the McIntyre Model 640 Shear, a recycling machine used to cut metal. Nicastro's right hand accidentally got caught in the machine's blades, severing four of his fingers. The Model 640 Shear was manufactured by J. McIntyre Machinery, Ltd. (J. McIntyre), a company incorporated in the United Kingdom, and then sold, through its exclusive United States distributor, McIntyre Machinery America, Ltd. (McIntyre America), to Curcio Scrap Metal.

In September 2003, plaintiff named J. McIntyre and McIntyre America as defendants in a product-liability action, *N.J.S.A.* 2A:58C–2, in the Superior Court, Law Division, Bergen County. The complaint alleged that the shear machine manufactured by J. McIntyre and distributed by McIntyre America "was not reasonably fit, suitable, or safe for its intended purpose."[1] The complaint, in particular, asserted that the machine "failed to contain adequate warnings or instructions," and that its defective design "allow[ed] the plaintiff to become injured while operating the machine in the normal course of his employment." The focus of this product-liability lawsuit, as made clear from plaintiff's expert's report, is that the McIntyre Model 640 Shear did not have a safety guard that would have prevented the accident. Plaintiff is seeking

---

[1] Nicastro's wife, Roseann, also a plaintiff, filed a loss-of-consortium claim in the same complaint. For the sake of convenience, we refer only to plaintiff Robert Nicastro.

damages for past and future medical expenses, lost wages, and physical pain and suffering.[2]

## B.

The trial court granted J. McIntyre's motion to dismiss the action, finding that the English manufacturer did not have sufficient minimum contacts with New Jersey to justify the State's exercise of personal jurisdiction over it. Alternatively, the court held that even under "the most liberal[ly] accepted form of the stream of commerce theory," J. McIntyre "would not be subject to personal jurisdiction in New Jersey."

In an unreported opinion, the Appellate Division reversed, allowing the parties to engage in discovery to establish whether New Jersey has the authority to exercise jurisdiction over J. McIntyre on the basis of either a traditional minimum-contacts analysis or the stream-of-commerce theory as articulated in *Charles Gendler* or in Justice O'Connor's plurality opinion in *Asahi Metal Industry Co. v. Superior Court of California*, 480 *U.S.* 102, 107 *S.Ct.* 1026, 94 *L.Ed.*2d 92 (1987) (plurality opinion).

Here is the relevant information adduced during the discovery period. In either 1994 or 1995, Frank Curcio, the owner of Curcio Scrap Metal of Saddle Brook, New Jersey, attended a trade convention in Las Vegas, Nevada, sponsored by the Institute of Scrap Recycling Industries. While there, he visited the booth of McIntyre America and was introduced to the McIntyre Model 640 Shear.

In 1995, Curcio Scrap Metal purchased the machine from McIntyre America at a cost of $24,900. The machine was shipped from McIntyre America's headquarters in Stow, Ohio to Saddle Brook, and the invoice instructed that the check be made payable to "McIntyre Machinery of America, Inc." Affixed to the machine

---

[2] McIntyre America, the distributor, filed for bankruptcy in 2001 and has not participated in this lawsuit.

was a label with the following information: "J. McIntyre Machinery," its address, and the model and serial number of the machine. Curcio also received an information sheet listing J. McIntyre's address in Nottingham, England, as well as its telephone and fax numbers. An instruction manual that accompanied the shear machine referenced both United States and United Kingdom safety regulations. Based on documentation received with the machine, Curcio concluded that "had we needed any repair parts, we would have called J. McIntyre Machinery Ltd. in England, which is where we would call today for repairs or parts." [3]

J. McIntyre's principal place of business is in Nottingham, England, where it designs and manufactures metal recycling machinery and equipment. It holds American and European patents in recycling technology. Michael Pownall, the president of J. McIntyre, attended the scrap metal conventions held in Las Vegas in 1994 and 1995, including the one where Curcio visited the McIntyre America booth. Additionally, from at least 1990 until 2005, J. McIntyre officials, including Pownall, attended trade conventions, exhibitions, and conferences throughout the United States in such cities as Chicago, Las Vegas, New Orleans, Orlando, San Diego, and San Francisco. During the period that McIntyre America was the exclusive United States distributor for J. McIntyre's products, McIntyre America fielded any requests for information about those products at the scrap metal conventions and trade shows in the United States.

J. McIntyre and its American distributor were distinct corporate entities, independently operated and controlled, without any common ownership. McIntyre America, however, "structured [its] advertising and sales efforts in accordance with [J. McIntyre's]

---

[3] Curcio's perception, at the time of purchase and today, is in no way altered by a J. McIntyre representative's claim that "[J.] McIntyre does not, and never did, provide maintenance or repair services for its products to businesses or individuals in *New Jersey*." (Emphasis added). The representative did not suggest that J. McIntyre was not servicing its machines in states other than New Jersey.

direction and guidance whenever possible."[4]  Although J. McIntyre claimed that it sold its machines outright to McIntyre America, the correspondence between the two companies suggests that at least some of the machines were sold on consignment to its American distributor.  For example, in a 1999 letter to McIntyre America, J. McIntyre's president noted:  "[Y]ou still have new machines in stock, which you are presently unable to sell.  Please note that those machines are our property until they have been paid for in full."  Indeed, in a 1999 e-mail, McIntyre America reported to J. McIntyre that it had "no problem waiting for [J. McIntyre] to receive payment from the customer first before requesting our commission via a company invoice in the future."[5]

At the conclusion of jurisdictional discovery, the trial court again granted J. McIntyre's motion to dismiss for lack of personal jurisdiction.  The court emphasized that J. McIntyre had "no contacts with the state of New Jersey"—it did not directly sell or solicit business in this State or have a physical presence here.  Not only did the court find no evidence establishing a connection between J. McIntyre and this State, but it also concluded that J. McIntyre had no "expectation that its product would be purchased and utilized in New Jersey."  The court maintained that "[t]he fact that [J. McIntyre] may have sufficient aggregate minimum contacts with the United States to establish jurisdiction in this country is not a reason to extend jurisdiction to the Superior Court of New Jersey."  In the court's view, J. McIntyre could be haled into a New Jersey court under the stream-of-commerce theory only if the company engaged in a nationwide distribution scheme that "purposefully brought [J. McIntyre's] shear machines to New Jersey" and the company "purposely availed itself of the protections of [this State's] laws."

---

[4] This remark was set forth in a January 2000 letter from McIntyre America to J. McIntyre.

[5] For a more detailed account of the "discovery" evidence, *see Nicastro v. McIntyre Mach. Am., Ltd.*, 399 *N.J.Super.* 539, 545–48, 945 A.2d 92 (App.Div. 2008).

## II.

In an opinion authored by Judge Lisa, the Appellate Division reversed, concluding that the exercise of jurisdiction by New Jersey "would not offend traditional notions of fair play and substantial justice" and was justified "under the 'stream-of-commerce plus' rationale espoused by Justice O'Connor in *Asahi.*" *Nicastro v. McIntyre Mach. Am., Ltd.,* 399 *N.J.Super.* 539, 545, 945 *A.*2d 92 (App.Div.2008) (citing *Asahi, supra,* 480 *U.S.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104). The panel noted that in *Asahi* two different views of the stream-of-commerce doctrine of jurisdiction were advanced, one by Justice O'Connor and the other by Justice Brennan, with each view supported by four different members of the Court. *Id.* at 555–56, 945 *A.*2d 92. The panel held that the facts of this case met Justice O'Connor's more restrictive stream-of-commerce plus test, and therefore also satisfied Justice Brennan's framework for jurisdiction in stream-of-commerce cases. *Id.* at 557–58, 565, 945 *A.*2d 92.

The Appellate Division ultimately found that J. McIntyre not only "plac[ed] the shear machine that injured plaintiff into the stream of commerce by transferring it to its distributor, McIntyre America, with an awareness that its machine might end up in New Jersey, [but] also engaged in additional conduct indicating an intent or purpose to serve the New Jersey market." *Id.* at 558, 564–65, 945 *A.*2d 92 (citing *Asahi, supra,* 480 *U.S.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104). The Appellate Division identified a number of factors in reaching its determination: (1) J. McIntyre "designated McIntyre America as its exclusive distributor for the entire United States," and did so "for the purpose of selling its machines in all fifty states," *id.* at 558, 945 *A.*2d 92; (2) J. McIntyre knew "that McIntyre America was not the end user of the many machines it sold to McIntyre America," *id.* at 559, 945 *A.*2d 92; (3) when J. McIntyre's management officials attended trade conventions in cities in this country, the company "was engaged in purposeful conduct to avail itself of the entire United States market," *ibid.*; (4) the sale to Curcio of the McIntyre

Model 640 Shear "was the result of the very distribution scheme purposefully established by [J. McIntyre] for the sale of its machines to potential customers located anywhere within the exclusive sales territory of McIntyre America," which included New Jersey, *ibid.*; and (5) J. McIntyre designed the Model 640 Shear "to conform to United States specifications and requirements, and represented such compliance in the instruction manual that came with the machine," *id.* at 564, 945 *A.*2d 92.

Last, the panel emphasized New Jersey's "strong interest in providing a forum for its injured workers who sustain industrial accidents" and the practical benefits of litigating the case in this State, where the injury occurred and where the evidence and most of the witnesses are located. *Id.* at 565, 945 *A.*2d 92. The panel also noted that it would not be unreasonable to expect J. McIntyre officials, who have visited this country to promote its products, to travel to this State to respond to claims that one of its defectively designed machines caused serious and permanent injuries to a worker operating it. *Id.* at 565–66, 945 *A.*2d 92. For those reasons, the Appellate Division had "no hesitancy" in finding J. McIntyre subject to the jurisdiction of the New Jersey Superior Court. *Id.* at 566, 945 *A.*2d 92.

We granted J. McIntyre's petition for certification. 196 *N.J.* 344, 953 *A.*2d 763 (2008). We also granted the motion of the Association of Trial Lawyers-New Jersey to participate in this case as amicus curiae.[6]

### III.

Defendant J. McIntyre argues that the Appellate Division, in holding it subject to the jurisdiction of the New Jersey court system, did not properly apply Justice O'Connor's "stream-of-commerce plus" test as set forth in *Asahi.* Moreover, J. McIntyre

---

[6] The Association of Trial Lawyers-New Jersey is now known as the New Jersey Association for Justice.

posits that even under Justice Brennan's stream-of-commerce test, a New Jersey court could not assert its jurisdictional authority.

J. McIntyre disclaims any responsibility for the fact that its shear machine "made its way to New Jersey." It only admits that it did "limited business" in the United States and sold a purportedly defective machine to an Ohio distributor. It insists that it had no knowledge that the distributor would later sell the machine to a New Jersey customer. Because it claims to have had no role or control over the sale of the machine to a New Jersey business owner, J. McIntyre contends the "single act of placing the machine into the stream of commerce outside of New Jersey is not enough [for this State's courts] to exercise personal jurisdiction over [it] in accordance with due process." J. McIntyre disavows marketing its products in, or having any contacts or relationships with, New Jersey and therefore maintains that it would "offend traditional notions of fair play and substantial justice" for it to be subject to the jurisdiction of our courts. (Citation and internal quotation marks omitted). Finally, J. McIntyre submits that the Appellate Division has rendered meaningless Justice O'Connor's requirement that, in addition to placing a product in the stream of commerce, a manufacturer engage in conduct " 'purposefully directed toward the forum State,' " such as direct marketing or designing a product for a customer in a particular state. (Quoting *Asahi, supra,* 480 *U.S.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104). Due process, it submits, does not empower a state, such as New Jersey, to exercise jurisdiction over a foreign manufacturer doing business generally in the United States.

In contrast, plaintiff Nicastro asks this Court to affirm the Appellate Division and find that J. McIntyre is subject to the jurisdiction of this State's courts because it targeted the United States as its geographical market and placed in the stream of commerce the defective industrial machine that permanently injured him. Plaintiff considers the jurisdictional issue at the heart of this case settled by this Court's decision in *Charles Gendler.* He asserts that J. McIntyre "sells its products throughout the

United States, and yet claims immunity from suit anywhere, due to the strategy of using ... [a] financially-irresponsible distributor with a nearly identical name." He prophesizes that "[t]o permit [J. McIntyre] to avoid personal jurisdiction in this products-liability matter will create a road-map for foreign manufacturers on how to dump their unsafe products in the United States" and escape liability in the state where their products cause personal injuries. Plaintiff urges that public policy should not allow such a "flanking maneuver" that will "leav[e] a catastrophically-injured citizen without legal recourse."

Amicus curiae, the Association of Trial Lawyers—New Jersey, urges this Court to reaffirm the stream-of-commerce doctrine adopted in *Charles Gendler* and espoused by Justice Brennan in *Asahi* as the basis for our courts to exercise jurisdiction over a foreign manufacturer whose defective product injures a New Jersey resident. The Association maintains that the use of the stream-of-commerce plus theory to "requir[e] additional conduct directed specifically to New Jersey ... is a refusal to acknowledge the reality of globalization." It observes that "[n]o foreign manu-facturer can expect to sell its product to the United States market, whether through a distributor or otherwise, without the product ultimately becoming located in one of the fifty states," and there-fore J. McIntyre should not be surprised to be haled into a court of a state where its defective machine caused injury. Moreover, "[e]ven if there were personal jurisdiction over [J. McIntyre] in another State or the United Kingdom," the Association believes that requiring plaintiff to file a lawsuit in a place other than New Jersey, where he was injured and where everything relevant to his case is located, would defy this State's public policy to provide a forum for relief for workers victimized by defective products.

IV.

In determining whether our State courts have authority to exercise personal jurisdiction over J. McIntyre, we begin by dispensing with certain jurisdictional doctrines that do not apply

in this case.[7]  We do not find that J. McIntyre had a presence or minimum contacts in this State—in any jurisprudential sense—that would justify a New Jersey court to exercise jurisdiction in this case.  Plaintiff's claim that J. McIntyre may be sued in this State must sink or swim with the stream-of-commerce theory of jurisdiction.  Before turning to that claim, a brief history of the development of our law governing jurisdiction will help inform our analysis.

## A.

The power of a state to subject a person or business to the jurisdiction of its courts has evolved with the changing nature of the American economy.  Our country has grown from an agrarian/manufacture-based economy dominated by local markets to a national economy fueled by the forces of industrialization.  *See generally* Walter Licht, *Industrializing America: The Nineteenth Century* 133 (1995) (documenting evolution of American businesses from "producer[s] of small batches of goods sold in local and regional markets" to "marketers of mass-produced items nationally and even internationally").  Now, our nation is part of a global economy driven by startling advances in the transportation of products and people and instantaneous dissemination of information.  The expanding reach of a state court's jurisdiction, as permitted by due process, has reflected those historical developments.

In the nineteenth century, and earlier, a state court generally could not exercise personal jurisdiction over a non-resident defendant in accordance with due process unless the defendant was subject to process while physically present in the state.  *See*

---

[7] The facts in this case are basically undisputed.  It is the legal consequences that flow from the facts that are at issue.  Therefore, the standard of review is de novo.  *See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

*Pennoyer v. Neff,* 95 *U.S.* 714, 720–22, 24 *L.Ed.* 565, 568 (1878). That scheme emphasized the limits of a state's authority to subject a person outside its borders to the jurisdiction of its courts.

With the passage of time, technological progress in communications and transportation "increased the flow of commerce between States" and, correspondingly, "the need for [state courts to exercise] jurisdiction over nonresidents." *Hanson v. Denckla,* 357 *U.S.* 235, 250–51, 78 *S.Ct.* 1228, 1238, 2 *L.Ed.*2d 1283, 1296 (1958). That same technological progress has "made it much less burdensome for a party sued to defend [it]self in a State where [it] engages in economic activity." *McGee v. Int'l Life Ins. Co.,* 355 *U.S.* 220, 223, 78 *S.Ct.* 199, 201, 2 *L.Ed.*2d 223, 226 (1957). With the changing nature of the economy evolved a more flexible standard of jurisdiction "from the rigid rule of *Pennoyer v. Neff.*" *Hanson, supra,* 357 *U.S.* at 251, 78 *S.Ct.* at 1238, 2 *L.Ed.*2d at 1296. "In a continuing process of evolution [the United States Supreme Court] accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over [foreign] corporations." *McGee, supra,* 355 *U.S.* at 222, 78 *S.Ct.* at 200–01, 2 *L.Ed.*2d at 225. The Court "expand[ed] the permissible scope of state jurisdiction over foreign corporations and other nonresidents" due in large part "to the fundamental transformation of our national economy." *Id.* at 222, 78 *S.Ct.* at 201, 2 *L.Ed.*2d at 226.

In the mid-twentieth century, in *International Shoe Co. v. Washington,* the Court held that the State of Washington's courts could exercise personal jurisdiction over a Delaware corporation in proceedings instituted "to recover [the corporation's] unpaid contributions to the state unemployment compensation fund." 326 *U.S.* 310, 311, 321, 66 *S.Ct.* 154, 156, 161, 90 *L.Ed.* 95, 99, 105 (1945). The Delaware corporation had no offices or stock of merchandise in Washington but it directed eleven to thirteen salesmen who resided there and filled orders for products shipped into the state. *Id.* at 313–14, 66 *S.Ct.* at 157, 90 *L.Ed.* at 100. Because of the salesmen's "systematic and continuous" activities in

Washington, the Court found that the jurisdictional requirements of due process had been met in rendering the out-of-state corporation accountable in Washington's courts. *Id.* at 320, 66 *S.Ct.* at 160, 90 *L.Ed.* at 104. In words now familiar, the Court noted that

due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have *certain minimum contacts* with it such that *the maintenance of the suit does not offend* "*traditional notions of fair play and substantial justice.*"

[*Id.* at 316, 66 *S.Ct.* at 158, 90 *L.Ed.* at 102 (second and third emphases added) (quoting *Milliken v. Meyer,* 311 *U.S.* 457, 463, 61 *S.Ct.* 339, 343, 85 *L.Ed.* 278, 283 (1940)).]

In *McGee v. International Life Insurance Co.,* the Court held that a California state court properly exercised personal jurisdiction over a Texas life insurance company, which reneged on paying the beneficiary—a California resident—the proceeds of a policy on the death of the insured. 355 *U.S.* at 221–23, 78 *S.Ct.* at 200–01, 2 *L.Ed.*2d at 224–26. Although the Texas company was not technically "present" in California, "[t]he [insurance] contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died." *Id.* at 222–23, 78 *S.Ct.* at 200–01, 2 *L.Ed.*2d at 225–26. For due-process purposes, it was sufficient "that the suit was based on a contract which had [a] substantial connection with [California]." *Id.* at 223, 78 *S.Ct.* at 201, 2 *L.Ed.*2d at 226.

During the thirty-five years following *International Shoe,* a rapidly changing world economy required the United States Supreme Court to think anew about the limits of a state court's jurisdictional reach. In *World–Wide Volkswagen Corp. v. Woodson,* the Court addressed for the first time whether an international manufacturer or distributor that places in the stream of commerce a purportedly defective product could be subject to the jurisdiction of a state where the product was purchased or accident occurred. 444 *U.S.* 286, 297–98, 100 *S.Ct.* 559, 567, 62 *L.Ed.*2d 490, 501–02 (1980).

In that case, the Robinsons claimed that they were traveling through Oklahoma in their Audi when another vehicle struck their

car in the rear, causing severe injuries due to a fire triggered by the "defective design and placement of the Audi's gas tank and fuel system." *Id.* at 288, 100 *S.Ct.* at 562, 62 *L.Ed.*2d at 495. The Robinsons, who were residents of New York where the Audi was purchased, filed a product-liability action in Oklahoma. *Ibid.* The Court reaffirmed *International Shoe*'s minimum-contacts test and pronounced that the Due Process Clause did not permit an Oklahoma court to exercise in personam jurisdiction over an Audi's retailer and wholesale distributor, both incorporated in New York, when their "only connection with Oklahoma [was] the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma." [8] *Id.* at 287–89, 299, 100 *S.Ct.* at 562–63, 568, 62 *L.Ed.*2d at 495–96, 502.

However, the Court posited a new theory of state-court jurisdiction—the stream of commerce—to respond to the contemporary realities of modern commerce. The Court stated that

[w]hen a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a [foreign automobile] manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. *The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.*

---

[8] In *World–Wide Volkswagen,* the manufacturer of the Audi automobile did not challenge jurisdiction in that product-liability case. 444 *U.S.* at 288 & n.3, 100 *S.Ct.* at 562–63 & n.3, 62 *L.Ed.*2d at 495–96 & n.3. Therefore, the Court addressed, exclusively, Oklahoma's assertion of jurisdiction over the automobile's regional distributor and retail dealer, not its foreign manufacturer. *Ibid.*; *see also Juelich v. Yamazaki Mazak Optonics Corp.,* 682 *N.W.*2d 565, 571 n.4 (Minn.2004) ("While the example used by the Court [to illustrate the stream-of-commerce theory] dealt with jurisdiction over manufacturers and national distributors, the only parties contesting jurisdiction in *World–Wide Volkswagen* were the retail dealer and regional distributor.").

[*Id.* at 297–98, 100 *S.Ct.* at 567, 62 *L.Ed.*2d at 501–02 (emphasis added) (citation omitted).]

That formulation of the stream-of-commerce theory did not afford jurisdiction to an Oklahoma court against the automobile's retailer and distributor. *Id.* at 298, 100 *S.Ct.* at 567, 62 *L.Ed.*2d at 502.

Interestingly, in his dissent, Justice Brennan observed that "[t]he model of society on which the *International Shoe* Court based its opinion is no longer accurate" given the increased mobility of people and products due to the advances in transportation and communication. *Id.* at 308–09, 100 *S.Ct.* at 568, 62 *L.Ed.*2d at 508–09 (Brennan, J., dissenting). He did not believe that if "a State [gave] a nonresident defendant adequate notice and opportunity to defend, . . . the Due Process Clause is offended merely because the defendant has to board a plane to get to the site of the trial." *Id.* at 310–11, 100 *S.Ct.* at 568, 62 *L.Ed.*2d at 510. Nevertheless, Justice Brennan would require the plaintiff to bear the burden of "demonstrat[ing] sufficient contacts among the parties, the forum, and the litigation to make the forum a reasonable State in which to hold the trial." *Id.* at 312, 100 *S.Ct.* at 568, 62 *L.Ed.*2d at 511.

In the wake of *World–Wide Volkswagen,* and in recognition of the complex international marketing schemes that bring products into our State, in *Charles Gendler & Co. v. Telecom Equipment Corp.,* we "adopt[ed] the stream-of-commerce theory as a basis for asserting personal jurisdiction over a non-resident defendant." 102 *N.J.* 460, 477, 508 *A.*2d 1127 (1986). In *Charles Gendler,* the defendant Japanese manufacturer opposed New Jersey's assertion of jurisdiction in a suit involving its sale of an allegedly defective telephone system through its New York subsidiaries to an independent New Jersey corporation, which then sold the defective product to the plaintiff, Charles Gendler & Co., Inc., a company with a business office in New Jersey. *Id.* at 467, 508 *A.*2d 1127.

In adopting the stream-of-commerce theory, we took into account the contemporary reality of how companies in foreign countries market their products in the United States. *See id.* at

477–79, 508 A.2d 1127. We observed that for a foreign manufacturer, "the sale of its product in a distant state is not simply an isolated event, but the result of the corporation's efforts to cultivate the largest possible market for its product." *Id.* at 477–78, 508 A.2d 1127. We acknowledged that "[i]n today's complex business world, foreign manufacturers rarely deliver products directly to consumers in the United States," but instead "employ middlemen, many of whom are often independent, to act as their distribution arms." *Id.* at 479, 508 A.2d 1127. With that understanding, we rejected the notion that foreign manufacturers should "be allowed to insulate themselves by using intermediaries in a chain of distribution or by professing ignorance of the ultimate destination of their products." *Ibid.*

In *Charles Gendler*, in considering a state court's power to exercise in personam jurisdiction, we charted the contours of the stream-of-commerce theory. *See id.* at 480–81, 508 A.2d 1127. First, "the stream-of-commerce theory supports the exercise of jurisdiction if the manufacturer knew or reasonably should have known of the distribution system through which its products were being sold in the forum state." *Id.* at 480, 508 A.2d 1127. Second, "a manufacturer need not so control the distribution system to place its products into the stream of commerce and, therefore, control of that system is not necessary to subject the manufacturer to the jurisdiction of the forum state." *Id.* at 481, 508 A.2d 1127. Thus, "[t]he focus is on the manufacturer's actual or constructive awareness of the system, not on control of the distribution of its products." *Ibid.* Third, "[a] manufacturer's awareness of the distribution system, through which it receives economic and legal benefits, justifies subjecting the manufacturer to the jurisdiction of every forum within its distributors' market area." *Ibid.* "Accordingly, a manufacturer that knows its products are distributed through a nationwide distribution system should reasonably expect that those products would be sold throughout the fifty states and that it will be subject to the jurisdiction of every state." *Ibid.* Last, a manufacturer that wishes to avoid the jurisdiction of a particular state must at least

"attempt[ ] to preclude the distribution and sale of its products in [that] state." *Ibid.*

In light of that new pronouncement on the stream-of-commerce theory, we remanded for additional discovery relating to jurisdiction, with a specific focus on "whether [the foreign defendant] was aware or should have been aware of a system for distributing its telephones throughout the United States." *Id.* at 483, 508 *A.2d* 1127.

A year after *Charles Gendler,* the United States Supreme Court in *Asahi Metal Industry Co. v. Superior Court of California,* 480 *U.S.* 102, 107 *S.Ct.* 1026, 94 *L.Ed.*2d 92 (1987), elaborated on the stream-of-commerce theory in two competing four-member opinions.  In that case, the plaintiff in a product-liability action sued the Taiwanese manufacturer of an allegedly defective motorcycle tire tube that exploded on a California roadway, causing an accident that severely injured the plaintiff-driver and killed his wife.  *Id.* at 105–06, 107 *S.Ct.* at 1029, 94 *L.Ed.*2d at 100.  The Taiwanese manufacturer, in turn, sought indemnification from its codefendant, Asahi Metal Industry Co., Ltd., the Japanese manufacturer of the tube's valve assembly.  *Id.* at 106, 107 *S.Ct.* at 1029, 94 *L.Ed.*2d at 100–01.  After the plaintiff's claims were settled and dismissed, the Taiwanese manufacturer's indemnification action against Asahi in California remained.  *Id.* at 106, 107 *S.Ct.* at 1029, 94 *L.Ed.*2d at 100.  On one point all nine members of the Court agreed:  the California state court could not, consistent with due process, exercise personal jurisdiction over Asahi in the indemnification action.  *Id.* at 113–16, 107 *S.Ct.* at 1033–34, 94 *L.Ed.*2d at 105–07.

In finding that the California court lacked personal jurisdiction, Justice O'Connor, writing for four members of the Court, construed the facts under a test that has become known as stream-of-commerce plus.  *Id.* at 108–13, 107 *S.Ct.* at 1030–32, 94 *L.Ed.*2d at 102–05 (plurality opinion).  Under that test, the actions of a defendant must be *"purposefully directed toward the forum State"* for a court of that state to exercise personal jurisdiction.  *Id.* at

112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104. In Justice O'Connor's view, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Ibid.* The stream-of-commerce plus test requires that the defendant engage in "[a]dditional conduct ... indicat[ing] an intent or purpose to serve the market in the forum State." *Ibid.* That "additional conduct" could be "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Ibid.* Justice O'Connor emphasized that "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Ibid.*

Within that framework, Justice O'Connor found that the Japanese corporation Asahi did not "purposefully avail itself of the California market" simply by selling component parts to a Taiwanese manufacturer, even if Asahi was aware that the completed product would be sold in California. *Id.* at 112, 114, 107 *S.Ct.* at 1032–33, 94 *L.Ed.*2d at 104–06. Justice O'Connor reasoned that because Asahi had no offices or agents in California, did not advertise or solicit business in the state, and "did not create, control, or employ the distribution system that brought its valves" there, a California court could not exercise personal jurisdiction. *Id.* at 112–13, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 105. Justice O'Connor concluded that there was a lack of "minimum contacts" with California and therefore "the exercise of personal jurisdiction is [not] consistent with fair play and substantial justice." *Id.* at 116, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107.

Joined by three other members of the Court, Justice Brennan did not believe that Justice O'Connor's opinion kept faith with the stream-of-commerce theory enunciated in *World–Wide Volkswagen. Id.* at 116–21, 107 *S.Ct.* at 1034–37, 94 *L.Ed.*2d at 107–10

(Brennan, J., concurring in part and concurring in judgment). To trigger a court's power to exercise personal jurisdiction under the stream-of-commerce doctrine, Justice Brennan saw no need for a plaintiff to present "additional conduct" to establish that the defendant's acts were "purposefully directed toward the forum State." *Id.* at 116–17, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107 (citation and internal quotation marks omitted). According to Justice Brennan, "[t]he stream of commerce refers ... to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.* at 117, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107. Therefore, "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Ibid.* Thus, the burden of litigation in the forum state is an economic expense related to the cost of doing business. *Id.* at 117, 107 *S.Ct.* at 1034–35, 94 *L.Ed.*2d at 107. Justice Brennan observed that the commercial benefits of selling a product in a state "accrue regardless of whether that participant directly conducts business in ... or engages in additional conduct directed toward that State." *Id.* at 117, 107 *S.Ct.* at 1035, 94 *L.Ed.*2d at 107. He noted that "most courts and commentators have found that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of additional conduct." *Id.* at 117, 107 *S.Ct.* at 1035, 94 *L.Ed.*2d at 107–08.

Although Justice Brennan concluded that Asahi had the necessary minimum contacts with California, *id.* at 121, 107 *S.Ct.* at 1036–37, 94 *L.Ed.*2d at 110, he nevertheless agreed with Justice O'Connor that California's exercise of personal jurisdiction over Asahi would not comport with "fair play and substantial justice," [9]

---

[9] Justice Stevens, writing for himself and two other members of the Court, "[saw] no reason in this case for [Justice O'Connor's] plurality to articulate 'purposeful direction' or any other test as the nexus between an act of a defendant and the forum State that is necessary to establish minimum contacts." 480 *U.S.* at 122, 107 *S.Ct.* at 1037, 94 *L.Ed.*2d at 110 (Stevens, J., concurring in

*id.* at 116, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107 (citation and internal quotation marks omitted).

## B.

After *Asahi*, some federal and state courts have applied Justice O'Connor's stream-of-commerce plus theory.[10] Other courts have taken Justice Brennan's approach or have read *World–Wide Volkswagen* more expansively than Justice O'Connor's parsing of that opinion in *Asahi*.[11] Yet, others simply have declined to

---

part and concurring in judgment). Accordingly, Justice O'Connor could not garner five votes for her stream-of-commerce plus test. Nevertheless, Justice Stevens also agreed that California did not have a basis to assert jurisdiction because the "minimum requirements inherent in the concept of fair play and substantial justice ... defeat[ed] the reasonableness of jurisdiction." *Id.* at 121–22, 107 *S.Ct.* at 1037, 94 *L.Ed.*2d at 110 (citation and internal quotation marks omitted).

[10] *See, e.g., Bridgeport Music, Inc. v. Still N the Water Publ'g,* 327 *F.*3d 472, 479–80 (6th Cir.) (expressing "preference" for Justice O'Connor's approach and applying it to case), *cert. denied,* 540 *U.S.* 948, 124 *S.Ct.* 399, 157 *L.Ed.*2d 279 (2003); *Lesnick v. Hollingsworth & Vose Co.,* 35 *F.*3d 939, 944–46 (4th Cir.1994) (taking approach similar to that of Justice O'Connor), *cert. denied,* 513 *U.S.* 1151, 115 *S.Ct.* 1103, 130 *L.Ed.*2d 1070 (1995); *Boit v. Gar–Tec Prods., Inc.,* 967 *F.*2d 671, 681–83 (1st Cir.1992) (same); *Madara v. Hall,* 916 *F.*2d 1510, 1519 (11th Cir.1990) (same); *Sorrells v. R & R Custom Coach Works,* 636 *So.*2d 668, 674 (Miss.1994) (applying Justice O'Connor's theory); *Vt. Wholesale Bldg. Prods. v. J.W. Jones Lumber Co.,* 154 *N.H.* 625, 914 *A.*2d 818, 826 (2006) (declining "to adopt Justice Brennan's view," and "find[ing] Justice O'Connor's 'stream of commerce plus' theory more consistent with *World–Wide Volkswagen*").

[11] *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 *F.*3d 610, 613–15 (8th Cir.) (taking broad approach to stream-of-commerce theory), *cert. denied,* 513 *U.S.* 948, 115 *S.Ct.* 359, 130 *L.Ed.*2d 313 (1994); *Irving v. Owens–Corning Fiberglas Corp.,* 864 *F.*2d 383, 386 (5th Cir.) ("Because the Court's splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue, we continue to gauge [the defendant's] contacts with Texas by the stream of commerce standard as described in *World–Wide Volkswagen* and embraced in this circuit."), *cert. denied,* 493 *U.S.* 823, 110 *S.Ct.* 83, 107 *L.Ed.*2d 49 (1989); *State v. NV Sumatra Tobacco Trading, Co.,* 379 *S.C.* 81, 666 *S.E.*2d 218, 223 (2008) (finding personal jurisdiction under broad stream-of-commerce theory where defendant's "actions indicate that it purposely availed itself of conducting business in all 50 states, including South Carolina"); *Hill v. Showa Denko, K.K.,*

choose between the views of the two Justices—instead applying both, with some directing their analyses to Justice O'Connor's more restrictive approach without explicitly rejecting Justice Brennan's approach.[12]

In some cases, courts have dodged the stream-of-commerce conflict entirely by deciding a jurisdictional issue on firmer and more traditional grounds. For example, in *Lebel v. Everglades Marina, Inc.*, a contract-dispute case involving a claim of fraud, we saw no need to decide whether the defendant Florida company, which sold a luxury racing boat to a New Jersey resident, was subject to the jurisdiction of a New Jersey court based on the

188 *W.Va.* 654, 425 *S.E.*2d 609, 616 (1992) (noting that under stream-of-commerce theory, personal jurisdiction "can be exercised without the need to show additional conduct by the defendant aimed at the forum state"), *cert. denied,* 508 *U.S.* 908, 113 *S.Ct.* 2338, 124 *L.Ed.*2d 249 (1993); *Kopke v. A. Hartrodt S.R.L.,* 245 *Wis.*2d 396, 629 *N.W.*2d 662, 674 (2001) ("We believe the stream of commerce theory as set forth by Justice Brennan is the correct analysis to apply to the case at hand."), *cert. denied,* 534 *U.S.* 1079, 122 *S.Ct.* 808, 151 *L.Ed.*2d 694 (2002).

12 *See, e.g., Kernan v. Kurz–Hastings, Inc.,* 175 *F.*3d 236, 244 (2d Cir.1999) (declining to "adopt either view of the 'stream of commerce' standard" because jurisdiction existed even under Justice O'Connor's "more restrictive view"); *Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 *F.*3d 197, 205–07 (3d Cir.1998) (taking approaches articulated by both Justices O'Connor and Brennan); *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 *F.*3d 1558, 1566 (Fed.Cir.) (same), *cert. dismissed,* 512 *U.S.* 1273, 115 *S.Ct.* 18, 129 *L.Ed.*2d 917 (1994); *Vermeulen v. Renault, U.S.A., Inc.,* 985 *F.*2d 1534, 1547–48 (11th Cir.) (refusing to determine which approach controls because jurisdiction could be exercised even under Justice O'Connor's "more stringent 'stream of commerce plus' analysis"), *cert. denied,* 508 *U.S.* 907, 113 *S.Ct.* 2334, 124 *L.Ed.*2d 246 (1993); *A. Uberti & C. v. Leonardo,* 181 *Ariz.* 565, 892 *P.*2d 1354, 1359 (refraining from "enter[ing] the debate between" *Asahi's* theories because "we decide this case under *Asahi's* more restrictive interpretation of due process"), *cert. denied,* 516 *U.S.* 906, 116 *S.Ct.* 273, 133 *L.Ed.*2d 194 (1995); *Wiles v. Morita Iron Works Co.,* 125 *Ill.*2d 144, 125 *Ill.Dec.* 812, 530 *N.E.*2d 1382, 1389 (1988) ("We need not decide [between *Asahi's* theories] ... for we believe that even under the broader version of the stream of commerce theory there were no minimum contacts...."); *State v. Grand River Enters., Inc.,* 757 *N.W.*2d 305, 314 (S.D.2008) ("We do not reach the State's 'plus' argument because we conclude that the State failed to meet its

stream-of-commerce theory. 115 *N.J.* 317, 319–20, 558 *A.*2d 1252 (1989) ("Rather than embark on a prediction of the future course of this stream of jurisprudence, we shall hew closely to the limited fundamentals about which there is little or no dispute or debate."). Instead, we turned to the traditional *International Shoe* standard, finding that the defendant's actions met the minimum-contacts requirement and that the exercise of jurisdiction by New Jersey would not offend " 'traditional notions of fair play and substantial justice.' " *Id.* at 321–29, 558 *A.*2d 1252 (quoting *Int'l Shoe Co., supra,* 326 *U.S.* at 316, 66 *S.Ct.* at 158, 90 *L.Ed.* at 102).

Here, unlike in *Lebel,* we cannot evade consideration of the stream-of-commerce theory for it is the only basis on which the English manufacturer could be subject to the jurisdiction of a New Jersey court.

## V.

New Jersey has a long-arm rule that permits service of process on a non-resident defendant "consistent with due process of law." *R.* 4:4–4(b)(1). Therefore, our State courts may exercise jurisdiction over a non-resident defendant "to the uttermost limits permitted by the United States Constitution." *Avdel Corp. v. Mecure,* 58 *N.J.* 264, 268, 277 *A.*2d 207 (1971). There is no question that the United States Supreme Court in *Asahi* embraced the stream-of-commerce theory in one form or another. In the twenty-two years since *Asahi,* transnational commerce has accelerated, and we realize more than ever that we live in a global marketplace. In light of *Asahi,* and given what we know of the modern economic world, we must decide whether the stream-of-commerce test that we set forth in *Charles Gendler* comports with the Due Process Clause of the Fourteenth Amendment.

---

burden of proof even under the more inclusive expectation standard in *World-Wide Volkswagen/Asahi.*").

## A.

Today, we reaffirm the reasoning of our decision in *Charles Gendler*, and hold that a foreign manufacturer that places a defective product in the stream of commerce through a distribution scheme that targets a national market, which includes New Jersey, may be subject to the in personam jurisdiction of a New Jersey court in a product-liability action. All in all, *Charles Gendler*, in pronouncing when a State court can exercise personal jurisdiction over a defendant based on the stream-of-commerce doctrine, gave a faithful and fair reading of *World–Wide Volkswagen*, one that is more reflective of Justice Brennan's views expressed in *Asahi*.

Notably, where a foreign manufacturer has sold its products through a nationwide distribution scheme, some courts—including the Appellate Division in this case—have construed Justice O'Connor's stream-of-commerce plus theory in *Asahi* in a way that is indistinguishable from *Charles Gendler* and the general language of *World–Wide Volkswagen*. *See, e.g., Tobin v. Astra Pharm. Prods., Inc.*, 993 *F.*2d 528, 543–45 (6th Cir.), *cert. denied,* 510 *U.S.* 914, 114 *S.Ct.* 304, 126 *L.Ed.*2d 252 (1993); *A. Uberti & C. v. Leonardo*, 181 *Ariz.* 565, 892 *P.*2d 1354, 1360–64, *cert. denied,* 516 *U.S.* 906, 116 *S.Ct.* 273, 133 *L.Ed.*2d 194 (1995); *Nicastro, supra,* 399 *N.J.Super.* at 557–60, 564–65, 945 *A.*2d 92.

Those courts did not believe that Justice O'Connor intended that a foreign manufacturer seeking to capture a national market through a nationwide distribution scheme would be immune from suit in every state. In the views of those courts, the additional conduct required by Justice O'Connor under her stream-of-commerce approach would be the targeting of the national market through, among other things, general sales solicitations orchestrated by a manufacturer's independent distributor. *See, e.g., Tobin, supra,* 993 *F.*2d at 543–45; *A. Uberti & C., supra,* 892 *P.*2d at 1360–65; *Nicastro, supra,* 399 *N.J.Super.* at 557–60, 564–65, 945 *A.*2d 92. Thus, even under Justice O'Connor's approach, arguably, a manufacturer would be amenable to jurisdiction in

every state that is part of its national distribution scheme. *See, e.g., Tobin, supra,* 993 *F.*2d at 543–45 (permitting Kentucky to exercise personal jurisdiction over Netherlands drug manufacturer, which sought Federal Drug Administration approval for drug and, through American distributor, "made a deliberate decision to market [the drug] in all 50 states, including Kentucky"); *A. Uberti & C., supra,* 892 *P.*2d at 1360–65 (permitting Arizona to exercise personal jurisdiction over Italian firearms manufacturer, which sold revolvers intended for sale in United States through American distributor); *Nicastro, supra,* 399 *N.J.Super.* at 564, 945 *A.*2d 92 ("[D]efendant's conduct in establishing and operating under this exclusive distributorship arrangement constituted the necessary other conduct by which it purposefully availed itself of the benefits and protections of all fifty states, including New Jersey.").

*Charles Gendler,* although decided twenty-three years ago, speaks to the present realities of international trade and complex marketing techniques of transnational corporations that bring products, some dangerous and defective, into our State. In *Charles Gendler,* we recognized approaches concerning jurisdiction in stream-of-commerce cases that had long been in use in New Jersey courts. *See Charles Gendler, supra,* 102 *N.J.* at 476–77, 508 *A.*2d 1127 (citing *Coons v. Honda Motor Co., Ltd. of Japan,* 176 *N.J.Super.* 575, 424 *A.*2d 446 (App.Div.1980), *vacated and remanded,* 455 *U.S.* 996, 102 *S.Ct.* 1625, 71 *L.Ed.*2d 857 (1982), *rev'd on other grounds,* 94 *N.J.* 307, 463 *A.*2d 921 (1983), *reh'g granted,* 95 *N.J.* 234, 470 *A.*2d 446, *modified,* 96 *N.J.* 419, 476 *A.*2d 763 (1984), *cert. denied,* 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985); *Certisimo v. Heidelberg Co.,* 122 *N.J.Super.* 1, 298 *A.*2d 298 (Law Div.1972), *aff'd sub nom. Van Eeuwen v. Heidelberg E., Inc.,* 124 *N.J.Super.* 251, 306 *A.*2d 79 (App.Div. 1973)).

The preeminent issue is whether we will read the Due Process Clause in a way that renders a state, such as New Jersey, powerless to provide relief to a resident who suffers serious injuries from a product that was sold and marketed by a manufac-

turer, through an independent distributor, knowing that the final destination might be a New Jersey consumer.

A number of significant policy reasons animate the approach articulated in *Charles Gendler*—the approach we follow today. A state has a strong interest in protecting its citizens from defective products, whether those products are toys that endanger children, tainted pharmaceutical drugs that harm patients, or workplace machinery that causes disabling injuries to employees. A state also has a paramount interest in ensuring a forum for its injured citizens who have suffered catastrophic injuries due to allegedly defective products in the workplace. *See Burger King Corp. v. Rudzewicz*, 471 *U.S.* 462, 473, 105 *S.Ct.* 2174, 2182, 85 *L.Ed.*2d 528, 541 (1985) ("A State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." (citation and internal quotation marks omitted)); *see also Charles Gendler, supra,* 102 *N.J.* at 483, 508 *A.*2d 1127 ("A state's interest in providing a forum for its residents is more compelling in a personal injury action than in commercial litigation.").

It would be strange indeed if a New Jersey manufacturer that makes a defective and dangerous product and is both subject to the jurisdiction of our courts and accountable under our product-liability laws would be able to move its plant to a foreign land and peddle its wares through an independent distributor across the nation, with some purchased by New Jersey consumers, and suddenly become beyond the reach of one of our injured citizens through this State's legal system. Our conception of jurisdiction must surely comport with traditional notions of fair play and substantial justice, but must also reflect modern truths—the radical transformation of the international economy. Just as changing times led the United States Supreme Court to jettison " 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over [foreign] corporations," *McGee, supra,* 355 *U.S.* at 222, 78 *S.Ct.* at 200–01, 2 *L.Ed.*2d at 225, so too must we discard outmoded constructs of jurisdiction in product-

liability cases, and embrace a modality that will provide legal relief to our citizens harmed by the products of a foreign manufacturer that knows or should know, through the distribution scheme it employs, that its wares might find their way into our State.

■ In today's world, foreign manufacturers, plying overseas markets, should be covered by insurance, accounting for the risks of doing business and providing a fund for consumers who may be injured by their products. *See World–Wide Volkswagen, supra,* 444 *U.S.* at 297, 100 *S.Ct.* at 567, 62 *L.Ed.*2d at 501. Defending a suit in one of the United States, moreover, is not as burdensome as it once might have been, given that air transport can bring the principals of a business here within hours and instantaneous communication allows an ongoing dialogue with counsel in this country. *See McGee, supra,* 355 *U.S.* at 223, 78 *S.Ct.* at 201, 2 *L.Ed.*2d at 226. If it is not inconvenient for the principals of a company to attend trade conventions and conduct business meetings with an independent distributor in this country for the purpose of marketing its products, then it should not be too great a burden to defend a lawsuit here when one of its defective products causes serious bodily injury. Although we cannot control manufacturing plants leaving this country or control a foreign manufacturer's employment policy, working conditions, or the quality of its operations, we can ensure that a manufacturer that targets its defective products at a wide geographic market that includes New Jersey will not be immune from suit in our State's courts. A manufacturer that wants to avoid being haled into a New Jersey court need only make clear that it is not marketing its products in this State. *See Charles Gendler, supra,* 102 *N.J.* at 481, 508 *A.*2d 1127.

B.

■ Before addressing the facts in this case, we restate the governing stream-of-commerce principles in *Charles Gendler* that will apply in a product-liability case.[13] A foreign manufacturer

___

[13] In this case, we address the stream-of-commerce doctrine in a product-liability action in which an allegedly defective machine severely injured a New

will be subject to this State's jurisdiction if it knows or reasonably should know that through its distribution scheme its products are being sold in New Jersey. *Id.* at 480, 508 *A.2d* 1127. A manufacturer that knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states must expect that it will be subject to this State's jurisdiction if one of its defective products is sold to a New Jersey consumer, causing injury. *Id.* at 480–81, 508 *A.2d* 1127. The focus is not on the manufacturer's control of the distribution scheme, but rather on the manufacturer's knowledge of the distribution scheme through which it is receiving economic benefits in each state where its products are sold. *Ibid.* A manufacturer cannot shield itself merely by employing an independent distributor—a middleman—knowing the predictable route the product will take to market. *Id.* at 479–80, 508 *A.2d* 1127. If a manufacturer does not want to subject itself to the jurisdiction of a New Jersey court while targeting the United States market, then it must take some reasonable step to prevent the distribution of its products in this State. *Id.* at 481, 508 *A.2d* 1127.[14]

---

Jersey resident. We do not discount that there may be cases in which a plaintiff's injury may be so minor that an assertion of jurisdiction by a New Jersey court would not comport with traditional notions of fair play and substantial justice. *See Charles Gendler, supra,* 102 *N.J.* at 482, 508 *A.2d* 1127 ("We recognize that the nature of the injury is relevant to the jurisdictional inquiry.").

[14] Given this detailed standard, taken from *Charles Gendler,* we are at a loss at how the dissent can claim that the majority has created "a new test that consists of but one inquiry: whether a product has found its way here." *Infra* at 83, 987 *A.2d* at 595. That mischaracterization is repeated in varying forms throughout the dissent. *See, e.g., infra* at 91-92, 987 *A.2d* at 600, 94-95, 987 *A.2d* at 602-03, 98-99, 987 *A.2d* at 604-05. It is the dissent's narrow parsing of *Charles Gendler,* not our copious quotations from and analysis of that opinion, which "has contorted the stream of commerce theory." *Infra* at 95, 987 *A.2d* at 602. The dissent turns a blind eye to the language in *Charles Gendler* that does not fit into its constricted view of jurisdiction. For example, the dissent tellingly omits that, under *Charles Gendler, supra,* a manufacturer with a "nationwide distribution system should reasonably expect that those products would be sold throughout the fifty states and that it will be subject to the jurisdiction of every state." 102

## C.

In light of those principles, we find that the record supports the exercise of jurisdiction over J. McIntyre under the stream-of-commerce doctrine. J. McIntyre, a company incorporated in the United Kingdom, targeted the United States market for the sale of its recycling products. It did so by engaging McIntyre America, an Ohio-based company, as its exclusive United States distributor for an approximately seven-year period ending in 2001. J. McIntyre knew or reasonably should have known that the distribution system extended to the entire United States, because its company officials, along with McIntyre America officials, attended scrap metal trade shows and conventions in various American cities where its products were advertised. Indeed, J. McIntyre's president was present at the Las Vegas trade convention where his exclusive distributor introduced plaintiff's employer to the allegedly defective McIntyre Model 640 Shear that severed four of plaintiff's fingers.

It is clear that those attending the scrap metal trade shows and conventions came from areas other than the cities hosting those events, and that the joint appearances by J. McIntyre and McIntyre America were calculated efforts to penetrate the overall American market. Plaintiff's employer, a New Jersey businessman, is just one example of a person who traveled thousands of miles to a convention where, by dint of a sales effort, he purchased one of J. McIntyre's machines. J. McIntyre may not have had access to McIntyre America's customer list, but J. McIntyre knew or reasonably should have known that its machines were being sold in states other than Ohio and in cities other than where the trade conventions were held. J. McIntyre may not have known the precise destination of a purchased machine, but it clearly knew or should have known that the products were intended for sale

---

*N.J.* at 481, 508 *A.*2d 1127. Ultimately, the dissent does not accept the basic teachings of *Charles Gendler* and would convert the "stream of commerce" doctrine into a dry bed.

and distribution to customers located anywhere in the United States.

J. McIntyre and McIntyre America shared a common name that may have suggested to unwitting members of the public some form of corporate relationship, despite the fact that both companies were independent business entities with different owners and management. The information sheet that accompanied the 640 Model Shear included J. McIntyre's address and telephone number and, according to the New Jersey businessman who purchased that machine, "had we needed any repair parts, we would have called J. McIntyre Machinery Ltd. in England, which is where we would call today for repairs or parts." There can be little doubt that J. McIntyre and McIntyre America worked together to promote and sell J. McIntyre products in the United States as evidenced by their shared communications and joint participation at industry trade conventions. It bears mentioning that J. McIntyre maintained ownership of at least some of its products delivered to McIntyre America until the distributor sold the products to a United States customer. Under that product-consignment relationship, McIntyre America would earn a commission from its sale of J. McIntyre's products after J. McIntyre collected its payment.

Because J. McIntyre knew or reasonably should have known that its distribution scheme would make its products available to New Jersey consumers, it now must present a compelling case that defending a product-liability action in New Jersey would offend " 'traditional notions of fair play and substantial justice.' " *Lebel, supra,* 115 *N.J.* at 328, 558 *A.2d* 1252 (citing *Burger King Corp., supra,* 471 *U.S.* at 477, 105 *S.Ct.* at 2184, 85 *L.Ed.*2d at 544). However, J. McIntyre cannot make out a case that travel to New Jersey is onerous or an unfair burden for it to bear. J. McIntyre's officials have visited various cities throughout the United States to promote its business interests, attending trade conventions and meeting with representatives of its exclusive distributor. Certainly, defending the product-liability action

in Ohio, where J. McIntyre's now-defunct exclusive distributor conducted business, or in Nevada, the site of the 1994 and 1995 trade conventions, would be no more convenient than in New Jersey. Indeed, New Jersey is a shorter distance from England than those locales, and neither the Ohio nor Nevada courts would seem to have an interest in resolving a product-liability action in which an English manufacturer's product injured a New Jersey resident in New Jersey.

On the other hand, New Jersey has a strong interest in exercising jurisdiction. Plaintiff is a New Jersey resident; the allegedly defective product was purchased by a New Jersey consumer, plaintiff's employer; the injury occurred in a New Jersey workplace; plaintiff was treated for his injuries in the New Jersey regional area; the evidence—the shear machine—and most of the necessary witnesses are located in New Jersey; and last, the law of this State likely will govern the action. It would be unreasonable to expect that plaintiff's only form of relief is to be found in the courts of the United Kingdom, which may not have the same protections provided by this State's product-liability law. Under all the circumstances, New Jersey has a rightful claim to resolve the dispute between the parties and to assert jurisdiction over this product-liability action. We will not deny plaintiff a forum in the courts of this State.

## VI.

The stream-of-commerce doctrine of jurisdiction is particularly suitable in product-liability actions. It will not necessarily be a substitute for other jurisdictional doctrines, i.e., minimum contacts, that will apply in contract and other types of cases. *See McKesson Corp. v. Hackensack Med. Imaging,* 197 *N.J.* 262, 266–67, 277–78, 962 *A.*2d 1076 (2009) (applying minimum-contacts test in holding that Texas court properly exercised personal jurisdiction over defendant New Jersey corporation that entered into commercial transactions with plaintiff-corporation in Texas). Within the confines of due process, jurisdictional doctrines must

reflect the economic and social realities of the day. The exercise of jurisdiction by New Jersey in this case is a reasoned response to the globalization of commerce that permits foreign manufacturers to market their products through distribution systems that bring those products into this State. With the privilege of distributing products to consumers in our State comes the responsibility of answering in a New Jersey court if one of those consumers is injured by a defective product.

For the reasons expressed, we affirm the judgment of the Appellate Division, which reinstated plaintiff's product-liability action, and remand this matter to the trial court for proceedings consistent with this opinion.

Justice HOENS, dissenting.

I respectfully dissent. Quoting extensively from this Court's decision in *Charles Gendler & Co. v. Telecom Equipment Corp.*, 102 *N.J.* 460, 508 *A.*2d 1127 (1986), the majority asserts, indeed insists, that it is merely reaffirming and applying the bedrock jurisdictional principles this Court has long embraced. *Ante* at 73, 987 *A.*2d at 589, 76-77, 987 *A.*2d at 591-92. The majority purports as well to harmonize the *Gendler* holding with the analyses set forth in the competing plurality opinions of the United States Supreme Court, *see Asahi Metal Indus. Co., Ltd.*, 480 *U.S.* 102, 107 *S.Ct.* 1026, 94 *L.Ed.*2d 92 (1987). In fact, the majority's opinion does nothing of the sort.

Instead, in place of utilizing any of the analytical frameworks found in those three precedents, the majority has created an entirely new and unbounded test for asserting jurisdiction over foreign entities. Indeed, it is only by ignoring the essential underpinnings shared by those three opinions that the majority can reach its result; it is only by the use of subtle and unspoken shifts in language and emphasis that the majority is able to transform *Gendler* from what it is to what the majority chooses to have it mean. And transform it is precisely what the majority does. Because where *Gendler* used the stream of commerce theory as but one part of a larger due process analysis, with its

traditional focus on the foreign defendant's connection to this forum, the majority has effectively substituted any effort by a manufacturer to sell its product anywhere in the nation as the only act needed for assertion of our jurisdiction.

Repeated quotations and soaring language about the realities of the global marketplace might compel the casual reader to follow what appears to be the majority's relentless logic. But those rhetorical techniques cannot mask the fact that the majority today embarks on a path that stretches our notions about due process, and about what is fundamentally fair, beyond the breaking point. In doing so, the majority has, notwithstanding its protestations to the contrary, elected to forge a new and uncharted path. Because it is a path with which I cannot agree, I dissent.

## I.

The issue presented to the Court in this dispute is a familiar one, for it requires us to decide whether our courts have jurisdiction over a foreign manufacturer of a product that is alleged to have injured one of our residents. At the same time, what might otherwise be an almost mundane exercise is complicated by the challenge of balancing the rights of the parties when the realities of a twenty-first century global economy strain against the outer limits of due process. In an effort to strike the right balance, we are asked to apply the stream of commerce theory, as articulated by this Court, *see Gendler, supra,* 102 *N.J.* at 480–81, 508 *A.*2d 1127; *cf. Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 558 *A.*2d 1252 (1989) (declining to employ stream of commerce in place of traditional jurisdictional analysis), and as explained in the competing plurality opinions handed down by the United States Supreme Court, *see Asahi, supra,* 480 *U.S.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104 (O'Connor, J., plurality opinion); *id.* at 117, 107 *S.Ct.* at 1034–35, 94 *L.Ed.*2d at 107–08 (Brennan, J., concurring). That theory, therefore, is at the heart of the debate in this appeal.

In the majority's view, applying that theory demands that this foreign manufacturer be subject to the jurisdiction of our courts. Objectively analyzed, however, it is hardly that simple, because in its articulation of the stream of commerce theory, the majority has strayed far from the precedents it purports to apply. Starkly stated, the majority has abandoned the cautious wisdom of *Gendler* and *Asahi*, creating in their place a new test that consists of but one inquiry: whether a product has found its way here. In the majority's version of the stream of commerce theory, that fact alone suffices to subject the manufacturer of that product to our jurisdiction. But the majority's opinion fails to articulate an analysis consistent with any of the well-established tests that have discussed the stream of commerce theory and, in the process, departs radically from all of them. More to the point, the majority reaches its result only by disregarding carefully developed notions of due process to which non-resident defendants always have been entitled. I therefore respectfully dissent.

Three opinions, one in *Gendler* and the two plurality opinions in *Asahi*, stand at the core of the debate over jurisdiction in this appeal. Although each uses "stream of commerce" as its central theme, those decisions agree on neither the meaning nor the implications of that concept as it relates to the exercise of jurisdiction. Instead, each of those opinions considers the manufacturer's use of modern commercial distribution schemes, referred to as the stream of commerce, as but one part of a traditional jurisdictional inquiry. In doing so, those opinions express diverse views that spring from different theoretical underpinnings, but none of them uses the stream of commerce concept as an independent source of jurisdiction; each considers it solely for the role it plays in the context of a due process analysis.

In reality, it is only by appreciating what each of those decisions actually understood the "stream of commerce" theory to mean that one can hope to apply any of those distinct theories about jurisdiction to this dispute. One cannot, as does the majority in this appeal, simply pluck out the words "stream of commerce"

from those opinions and, repeating them like some ancient incantation, imply that it is a free-standing theory that supports the result the majority reaches. Nor can one use the phrase as if it were a short-hand substitute for a single analytical approach, so as to suggest that one has adhered to settled principles expressed in those three opinions. On the contrary, a careful explanation of the different versions of the stream of commerce theory set forth in those three opinions will best illustrate how the majority's approach has departed from, rather than adhered to, any of those precedents.

## A.

This Court's prescient and groundbreaking opinion in *Gendler* is perhaps the best starting place, because it engaged in a thorough and scholarly analysis of the underlying problem of jurisdiction over foreign manufacturers that not only preceded the United States Supreme Court's effort to tackle the question, but that continues to serve us well today.

As the *Gendler* Court recognized, all questions concerning a state's assertion of personal jurisdiction "must comport with the due-process requirement of the fourteenth amendment." *Gendler, supra,* 102 *N.J.* at 469, 508 *A.*2d 1127. Although we have long interpreted our long-arm jurisdiction to be consistent with "the uttermost limits permitted by the United States Constitution," *ibid.* (quoting *Avdel Corp. v. Mecure,* 58 *N.J.* 264, 268, 277 *A.*2d 207 (1971)), the fundamental and unquestioned right of a foreign defendant to due process remains the essential touchstone of jurisdiction.

In *Gendler,* the Court traced the origins of the stream of commerce theory through a review of the historical development of our theories of long-arm jurisdiction generally, beginning with the requirement of physical presence, *ibid.* (citing *Pennoyer v. Neff,* 5 *Otto* 714, 95 *U.S.* 714, 24 *L.Ed.* 565 (1878)), through the minimum contacts approach begun thereafter, *see ibid.* (quoting *Int'l Shoe Co. v. Washington,* 326 *U.S.* 310, 316, 66 *S.Ct.* 154, 158,

90 *L.Ed.* 95, 102 (1945)), to explain the framework within which a stream of commerce theory might apply. As part of that analysis, the Court pointed out that deciding whether it is fair to subject any defendant to suit in a particular forum has evolved to include concepts such as whether defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *id.* at 471, 508 *A.*2d 1127 (quoting *Hanson v. Denckla,* 357 *U.S.* 235, 253, 78 *S.Ct.* 1228, 1240, 2 *L.Ed.*2d 1283, 1298 (1958)), and whether "defendant's contacts with the forum state [are] such that it 'should reasonably anticipate being haled into court there.'" *Id.* at 470, 508 *A.*2d 1127 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 *U.S.* 286, 297, 100 *S.Ct.* 559, 567, 62 *L.Ed.*2d 490, 501 (1980)).

The Court in *Gendler* pointed out that the United States Supreme Court, in *World–Wide Volkswagen,* had recognized the vitality of a stream of commerce theory, but described that theory as having two component parts. Quoting the United States Supreme Court, this Court described the theory as permitting the exercise of jurisdiction over a non-resident manufacturer if that manufacturer first, places its products into the stream of commerce and, second, does so "with the expectation that they will be purchased by consumers in the forum State." *Id.* at 474, 508 *A.*2d 1127 (quoting *World–Wide Volkswagen, supra,* 444 *U.S.* at 298, 100 *S.Ct.* at 567, 62 *L.Ed.*2d at 502). That second consideration, that is, the manufacturer's expectation, was related to the Court's reliance on a foreseeability analysis, and remains entirely consistent with the traditional inquiry about whether defendant could reasonably anticipate being "haled into court." *Id.* at 475, 508 *A.*2d 1127. Although this Court referred to the stream of commerce theory that had developed in the federal courts as "an independent basis to satisfy the minimum-contacts standard," *id.* at 476, 508 *A.*2d 1127 (citing *Burger King Corp. v. Rudzewicz,* 471 *U.S.* 462, 473, 105 *S.Ct.* 2174, 2182, 85 *L.Ed.*2d 528, 541 (1985)), its quotations from the United States Supreme Court's opinion in *Burger King* make plain that this Court recognized that stream of

commerce necessarily includes the element of expectation of purchase in this state. That is, by recognizing that there are two elements to the theory, this Court did not substitute mere usage of the stream of commerce as if it were a free-standing basis for jurisdiction, but instead included within it the fairness and foreseeability analyses that are essential to due process. *Ibid.*

Turning to an exhaustive analysis of both state and federal precedents in which the stream of commerce theory had been considered, this Court considered the exercise of jurisdiction over foreign manufacturers generally, finding that concepts such as the nature of the chosen chain of distribution, *see id.* at 477–78, 508 *A.*2d 1127, and evidence of a manufacturer's "purposeful penetration of the [forum state's] market," *id.* at 478, 508 *A.*2d 1127, were relevant to any consideration of the stream of commerce theory. In the end, however, the Court returned to fundamental concepts of due process, holding fast to considerations of purposeful availment, *ibid.,* reasonable expectations of being haled into court, *id.* at 475, 508 *A.*2d 1127, and receipt of benefits of the forum, *id.* at 480, 508 *A.*2d 1127, as the guiding principles of our jurisdictional analysis. This Court described with precision the test to be applied: "The crucial question is whether [the foreign manufacturer] was aware or should have been aware of a system of distribution that is *purposefully directed at New Jersey residents." Gendler, supra,* 102 *N.J.* at 484, 508 *A.*2d 1127 (emphasis added).

It is instructive to emphasize what *Gendler* did *not* decide. This Court did not conclude that the simple process of a product being placed into the general stream of commerce and ending up here was enough to support jurisdiction. Nor did this Court decide that creating a system of distribution that resulted in a product finding its way here was enough. Instead, this Court linked together two elements, awareness and purposefulness, that are critical, from the point of view of due process, to an exercise of jurisdiction. All of the comments in *Gendler* about the realities of a global economy and of nationwide patterns of distribution aside,

this Court remained true to concepts long recognized to be the fundamental basis on which any state can exercise jurisdiction over a foreign entity.

## B.

An analysis of the two competing plurality opinions of the United States Supreme Court in *Asahi, supra,* leads to a similar conclusion, that is, that in evaluating any state's exercise of long-arm jurisdiction, the Court's core concern is due process. On that point, both the plurality opinion authored by Justice O'Connor and the concurring opinion written by Justice Brennan agree. The basis for deciding all jurisdictional questions remains rooted in our traditional notions of due process, *see Asahi, supra,* 480 *U.S.* at 108–09, 107 *S.Ct.* at 1030, 94 *L.Ed.*2d at 102 (O'Connor, J., plurality opinion); *id.* at 117, 107 *S.Ct.* at 1034–35, 94 *L.Ed.*2d at 107–08 (Brennan, J., concurring), and must comport with "fair play and substantial justice," *see id.* at 113, 107 *S.Ct.* at 1033, 94 *L.Ed.*2d at 105 (O'Connor, J., plurality opinion) (quoting *Int'l Shoe, supra,* 326 *U.S.* at 316, 66 *S.Ct.* at 158, 90 *L.Ed.* at 102); *id.* at 116, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107 (Brennan, J., concurring) (quoting *Int'l Shoe, supra,* 326 *U.S.* at 320, 66 *S.Ct.* at 160, 90 *L.Ed.* at 104).

Each of the plurality opinions uses the same test, namely, whether the foreign manufacturer has done something to "purposefully avail itself of the market in the forum State." *Asahi, supra,* 480 *U.S.* at 110, 107 *S.Ct.* at 1031, 94 *L.Ed.*2d at 103 (O'Connor, J., plurality opinion); *id.* at 116–17, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107 (Brennan, J., concurring). Each, significantly, makes clear that it is inappropriate to define the stream of commerce theory in such a way that the label takes the place of an evaluation of purposeful availment.

That is, Justice O'Connor, as part of considering the stream of commerce theory, framed the question in terms of whether it is consistent with the protections afforded by the Due Process Clause to assert jurisdiction over a defendant whose product was

"swept" by the stream of commerce "into the forum State, but [where] the defendant did nothing else to purposefully avail itself of the market in the forum State." *Asahi, supra,* 480 *U.S.* at 110, 107 *S.Ct.* at 1031, 94 *L.Ed.*2d at 103. In her view, merely placing a product into the stream of commerce is insufficient to support jurisdiction because, without more, it cannot constitute action purposefully directed at the forum state. *Id.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104. Although reaching a different conclusion on what purposeful availment requires, Justice Brennan's opinion does not disagree with the notion that merely placing a product into the stream of commerce will not suffice. He explicitly pointed out that, in his understanding, "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.* at 117, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107.

Both of the plurality opinions in *Asahi,* therefore, caution against using "stream of commerce" as a surrogate for the analysis of the connection between the foreign entity and the forum that due process demands. The two opinions differ only in their definition of what, in addition to placing a product into the stream of commerce, will be required in order for the assertion of jurisdiction to pass constitutional muster.

For Justice O'Connor, the key lies in identifying sufficient additional conduct that would qualify to meet the test of purposeful availment. In her view, such conduct could be anything that would indicate that the foreign entity intended to serve a forum state's market, including: designing the product for the forum state's market; advertising there; establishing channels for providing regular advice to customers in the particular forum state; or marketing the product through a distributor that has agreed to serve as the sales agent in the forum state. *Id.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104.

Applying those concepts to the factual record before the Court in *Asahi,* Justice O'Connor concluded that the plaintiff's proofs fell short. She noted, for example, that the defendant did no business

in the forum state, had no office, no agents, no employees and no property there. *Id.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 105. She observed that the defendant did not create, control or directly utilize the distribution system that brought its product to the forum state, because its product was merely a component of a vehicle being sold and distributed by others. *Ibid.* Moreover, she found in the record no evidence that the defendant had designed its product in anticipation of sales in the forum state. *Id.* at 113, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 105. Because the record lacked any evidence of conduct by the defendant that would tend to demonstrate that it had engaged in purposeful availment of the benefits of the forum, the opinion concluded that due process considerations would be offended by requiring it to appear and defend there.

More to the point, Justice O'Connor's plurality opinion in *Asahi* closely linked the assertion of jurisdiction over a defendant that has introduced a product into the stream of commerce to traditional notions of personal jurisdiction and the Due Process Clause, because jurisdiction rested on conduct of some variety or an intentional act directed at the forum. Far from simply relying on the act of introducing one's product into the stream of commerce, her opinion is rooted in the well-settled principle that jurisdiction must be based on some action or conduct that demonstrates that the defendant has purposefully availed itself of the forum state's market.

Justice Brennan's concurring opinion in *Asahi* expressed a different view, but one that is equally grounded on ordinary concepts of due process and the extent to which that constitutional guarantee would be offended by the absence of a direct physical connection between the manufacturer's activities and the result of its product ending up in the forum state. He, too, considered the nature and extent of a manufacturer's activities that would suffice to satisfy the basic requirement that jurisdiction be supported by a defendant's purposeful availment of the forum state's market. *Id.* at 116–17, 107 *S.Ct.* at 1034–35, 94 *L.Ed.*2d at 107–08. He

disagreed with Justice O'Connor's conclusion that affirmative conduct was needed, reasoning that due process notions of purposeful availment could be satisfied instead by evidence demonstrating that the manufacturer was aware of the fact that its product was being marketed in the forum state. *Id.* at 116–17, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107. Simple awareness of a remote possibility, however, is insufficient for jurisdiction as Justice Brennan understood it. Rather, in his words,

> [t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.
>
> [*Id.* at 117, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107.]

Although Justice Brennan found it unnecessary for a plaintiff to show "additional conduct" directed toward the forum by a manufacturer, he defined the stream of commerce to include an affirmative awareness that the product, either separately or as a component part, is being marketed in the forum state. *Ibid.*

Justice Brennan commented that, as long as the manufacturer "is aware that the final product is being marketed in the forum," *ibid.*, there is a connection between the manufacturer and the forum sufficient for due process purposes. His opinion, therefore, did not substitute mere placement of a product into the stream of commerce for the ordinary requirements needed to satisfy due process. Nor did he embrace some metaphysical or theoretical definition of awareness. Instead, his opinion emphasized that there are two key indicia of "awareness" needed to support jurisdiction consistent with due process, namely, the regularity of the sales in or to the forum state and evidence of defendant's expectation that its product would be purchased there. *Id.* at 121, 107 *S.Ct.* at 1036–37, 94 *L.Ed.*2d at 110.

As part of his examination of the factual record in *Asahi,* Justice Brennan concluded that the evidence of regular and extensive sales of a product by the defendant to a manufacturer for incorporation as a component part, coupled with the defendant's

knowledge that the manufacturer was engaged in the regular course of selling the final product in the forum state, was the crucial basis for the exercise of jurisdiction. He pointed out that the defendant's components were included in at least eighteen percent of the products sold in one forum state store and that the defendant, on average, annually sold hundreds of thousands of its components to the manufacturer. *See id.* at 121 n. 4, 107 *S.Ct.* at 1037 n. 4, 94 *L.Ed.*2d at 110 n. 4. Justice Brennan, therefore, found ample support for the "awareness" analysis embodied in his stream of commerce theory, leading to the conclusion that the defendant's due process rights would not be abridged by subjecting it to jurisdiction. *Id.* at 121, 107 *S.Ct.* at 1036–37, 94 *L.Ed.*2d at 110.

## II.

Neither of the *Asahi* opinions abandoned due process as the essential underpinning of jurisdiction, or reliance on purposeful availment as the core of that analysis. Neither of the *Asahi* opinions, moreover, equated merely placing a product into the stream of commerce somewhere in the United States with purposeful availment sufficient to comport with due process and to support jurisdiction. On the contrary, as those opinions and this Court's decision in *Gendler* make clear, this Court and the United States Supreme Court have never strayed from the recognition that due process is fundamental to the constitutional assertion of jurisdiction over a non-resident defendant. This Court and the United States Supreme Court have never varied from holding that due process demands that there be some connection between a defendant and the forum, whether that analysis is expressed in terms of minimum contacts, *see Int'l Shoe, supra,* 326 *U.S.* at 316, 66 *S.Ct.* at 158, 90 *L.Ed.* at 102, or purposeful availment, *see Burger King, supra,* 471 *U.S.* at 475–76, 105 *S.Ct.* at 2183–84, 85 *L.Ed.*2d at 542–43, or an action purposefully directed toward the forum State, *see Asahi, supra,* 480 *U.S.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104 (O'Connor, J., plurality opinion), or awareness of

regular and extensive sales of its product by another, *see Asahi, supra,* 480 *U.S.* at 121, 107 *S.Ct.* at 1036–37, 94 *L.Ed.*2d at 110 (Brennan, J., concurring), or purposefulness demonstrated by the knowledge that one's products will be sold in the forum state, *see Gendler, supra,* 102 *N.J.* at 480, 508 *A.*2d 1127.

Today, in the guise of reaffirming *Gendler, ante* at 73, 987 *A.*2d at 589, the majority cuts all ties with precedent and does what *Asahi* warned against, equating the mere placement of a product into the stream of commerce somewhere with whatever due process would otherwise demand for assertion of jurisdiction anywhere. The majority does so by first conceding that nothing in this record would satisfy the traditional minimum contacts test, *ante* at 60-61, 987 *A.*2d at 582. It then describes the stream of commerce as if it were an alternative rationale, *ibid.,* proceeding thereafter to review the factual record in terms meant to match the ones used by this Court in *Gendler.*

As characterized by the majority, this case is about a foreign company that engaged in "purposeful marketing" of its product, *ante* at 52, 987 *A.*2d at 577, that used a "distribution scheme," *ibid.,* and that "targeted" a geographical market that included New Jersey, *ante* at 52, 987 *A.*2d at 577, 52-53, 987 *A.*2d at 577, 73, 987 *A.*2d at 589. There can be little debate, of course, that if defendant in fact had a "distribution scheme" like the ones considered in *Gendler* and *Asahi,* and if it "targeted" this state in particular, our traditional notions of due process would support the exercise of jurisdiction. This record, however, has evidence neither of a "distribution scheme" nor of "targeting" consistent with what this Court in *Gendler* or the United States Supreme Court in *Asahi* discussed. Indeed, it is only through subtle and unspoken, but analytically significant, shifts in the meaning of those phrases that the majority is able to assert that it is applying those precedents faithfully. It is, however, the very real distinctions between what the earlier opinions meant and what the majority today means that demonstrate that there is no faithful adherence to those precedents at all.

First, the "distribution scheme" in *Gendler* included a foreign manufacturer's creation of a wholly-owned subsidiary that was

authorized to do business in this state, *Gendler, supra,* 102 *N.J.* at 467, 508 *A.*2d 1127, and that company's use of another wholly-owned subsidiary that sold its products to a New Jersey corporation for eventual sale to plaintiff. *Ibid.* Moreover, the foreign corporation in *Gendler* conceded that the sale in New Jersey was "not an isolated transaction," *ibid.,* but was part of larger and "[d]eliberate sales efforts," *id.* at 469, 508 *A.*2d 1127, aimed at this state. Likewise, in *Asahi,* the foreign manufacturer's distribution system resulted in what Justice Brennan described as "regular and extensive sales" of its product for use as a component part in products sold in the state seeking to assert jurisdiction. *Asahi, supra,* 480 *U.S.* at 121, 107 *S.Ct.* at 1037, 94 *L.Ed.*2d at 110.

Nothing in this record approaches the sort of "distribution scheme" to which those precedents referred. Instead, we are confronted with a foreign manufacturer that chose an entirely distinct, unaffiliated Ohio corporation to serve as its distributor, that had little, if any, success in its efforts to control or direct that entity's activities, that sent a representative to trade shows somewhere in this country from time to time, and whose independent distributor made but one sale of a machine that ended up in this state. Notwithstanding that record, through clever repetition of phrases like "distribution scheme," the majority transforms what might at most be described as a trickle of goods into a flood of products sufficient to meet the demands of due process when, in truth, the facts fall short. Apparently mindful of Justice Brennan's caution that we not equate stream of commerce with the "unpredictable currents and eddies, but to the regular and anticipated flow of its products," *see id.* at 117, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107, the majority mischaracterizes the record to achieve precisely that end.

Second, the record is barren of the kind of targeting that this Court in *Gendler* and the United States Supreme Court in *Asahi* considered. In each of those opinions, the Courts evaluated the manufacturer's connection with the particular forum and utilized the stream of commerce to the extent that it played a role as the

vehicle for getting the product to that forum. For example, in *Gendler*, one could conclude that there was an effort to access and exploit a market in New Jersey because the manufacturer utilized an alter ego, a wholly-owned subsidiary doing business here, and engaged in "[d]eliberate sales efforts" aimed at this state. *Gendler, supra*, 102 *N.J.* at 469, 508 *A.*2d 1127. In *Asahi*, although the record was hardly extensive, both of the opinions are clear about what is required, at a minimum, for this element of the test. For Justice O'Connor, it remains purposeful availment as evidenced through conduct aimed at a particular forum's market, *see Asahi, supra*, 480 *U.S.* at 112, 107 *S.Ct.* at 1032, 94 *L.Ed.*2d at 104; for Justice Brennan, it requires affirmative awareness that the stream of commerce is being used to market the product in the target state, *id.* at 117, 107 *S.Ct.* at 1034, 94 *L.Ed.*2d at 107.

Nothing in this record rises to that level, for there is no evidence that the foreign corporation made any effort to send its products here; there is nothing more than a decision to market its product somewhere within this nation. Ignoring this Court's plain command in *Gendler* that the "crucial question" includes a "system of distribution that is purposefully directed at New Jersey residents," *Gendler, supra*, 102 *N.J.* at 484, 508 *A.*2d 1127, the majority simply replaces targeting of this state, which would comport with due process, with a generic effort toward the whole of the United States, which does not.

The majority has, in reality, redefined the crucial jurisdictional terms to suit its ends. Affixing the wholly unwarranted label of "distribution scheme" now takes the place of explaining how the marketing efforts in this record rise to the level contemplated by that phrase in *Gendler* or *Asahi*. Redefining the target market from this forum to "a geographical market that includes New Jersey," *ante* at 53, 987 *A.*2d at 577, masks the fact that there was no focus on this state. These are subtle shifts in emphasis indeed, but they are intentional ones, utilized to accomplish the majority's goal of transforming the due process requirement that there be a connection between the foreign entity and the forum state into a

test in which the mere act of placing a product into the general stream of commerce somewhere in this nation will suffice. Justice O'Connor and Justice Brennan both rejected such a view, and the suggestion that somehow in *Gendler* this Court did otherwise is false.

Merely including extensive quotations from *Gendler*, and from the competing plurality opinions in *Asahi*, does not equate with analytical faithfulness to the principles on which those cases rest. Citing *Gendler's* language about the global economy and about modern methods for distribution of allegedly dangerous products, as if those concerns alone support jurisdiction over a non-resident, misses the entire point of the *Gendler* analysis. Likewise, quoting from the opinions in *Asahi* without appreciating the fine distinctions about whether purposeful availment is tested by the additional conduct of the manufacturer, or by awareness of a regular and extensive distribution scheme, ignores the thorny constitutional questions those Courts, and this one, must confront fairly and squarely.

Instead of recognizing that in each of those opinions the stream of commerce is the beginning, and not the end, of the inquiry into jurisdiction, the majority has contorted the stream of commerce theory to its own ends. By ignoring the second half of the *Gendler* test, that is, the element of purposeful direction at New Jersey residents, *Gendler, supra*, 102 *N.J.* at 484, 508 *A.*2d 1127, the majority has transformed the analysis of the due process demands of jurisdiction into a single question: was a product introduced into the stream of commerce somewhere in the United States, eventually ending up here. That approach is not only circular and simplistic, it is, in the end, an unconstitutional one, because it is starkly inconsistent with fundamental notions of fairness and due process that this Court and the United States Supreme Court have identified as the touchstone of jurisdiction.

I part company with the majority's opinion because it fails to recognize that what gives content to the stream of commerce theory is the manufacturer's conduct, or knowledge, or awareness of what others were doing with its product. It is those elements

that satisfy the traditional component of purposeful availment and that, therefore, permit an exercise of jurisdiction that does not offend the outermost bounds of due process. Any jurisdictional inquiry must contend with the accepted two-part test, through which we recognize that due process demands some act, some evidence, some proof of affirmative awareness, that one's actions will likely result in a sale in the forum state. Because the majority has substituted any act, or potentially no act at all, that can be equated with permitting one's product to enter generally into the stream of commerce for that essential component of our due process analysis, I cannot agree.

### III.

I part from my colleagues for a separate reason, albeit one that requires only a brief exposition. In *World–Wide Volkswagen*, the United States Supreme Court commented that part of deciding whether it is reasonable to require a nonresident corporation to defend itself in a particular forum includes an analysis of factors other than those that focus on defendant alone. The Court noted:

> [T]he burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute[,] ... the plaintiff's interest in obtaining convenient and effective relief[,] ... the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies[.] [*World–Wide Volkswagen, supra*, 444 *U.S.* at 292, 100 *S.Ct.* at 564, 62 *L.Ed.*2d at 498 (citations omitted).]

Through this language, the Supreme Court made plain that the essential focus of the due process analysis must be on defendant and its relationship to the forum, and that the other considerations play a subsidiary role should the court conclude that there are sufficient contacts to support jurisdiction. In each of the decisions of that Court, the focus of the jurisdictional analysis is on defendant and its behavior or activities, rather than on plaintiff and his or her injuries or damages. The United States Supreme Court, although reciting facts relating to the damage or injury alleged, has done so in a cursory fashion, presumably to ensure that

sympathy for an injured plaintiff would not shift the focus away from the due process rights of the nonresident defendant. *See, e.g., Asahi, supra,* 480 *U.S.* at 105, 107 *S.Ct.* at 1029, 94 *L.Ed.*2d at 100 (noting that plaintiff was "severely injured"); *World–Wide Volkswagen, supra,* 444 *U.S.* at 288, 100 *S.Ct.* at 562, 62 *L.Ed.*2d at 495 (noting that plaintiffs were "severely burned" when their car caught fire after accident with another vehicle).

Apparently concluding that an appropriate evaluation of defendant's due process rights should instead be conducted only in the context of a full explanation of the factual assertions, the majority engages in an unnecessarily detailed description of plaintiff's severe injuries, coupled with repeated references to defendant's "dangerous" machine as the cause. That all of us desire to make certain that our citizens have access to our courts, that all of us agree that we should make a forum available so that injured individuals can achieve justice and fair compensation for their injuries caused by the negligence of others, is a given. But in this appeal, involving a dispute on a matter as to which the seriousness of the injury or the fault of the manufacturer is largely irrelevant, the majority's election to make such considerations so great a part of its reasoning suggests a disturbing shift in focus in two ways.

First, the majority rather inexplicably uses the fact of plaintiff's severe injuries to support its jurisdictional analysis, commenting that this newly adopted test applies in products liability cases, *ante* at 52, 987 *A.*2d at 577, and observing that lesser injuries somehow might not be sufficient to support jurisdiction, *ante* at 76-77, 987 *A.*2d at 591-92. Apparently, the majority's stream of commerce approach would not, in these same factual circumstances, afford sufficient basis for us to grant the machine's corporate owner access to our courts if it sought to pursue a contract or warranty claim. Likewise, the usual focus on due process as it applies to a foreign defendant now turns in some never explained fashion on whether the plaintiff includes the right sort of claim in the pleading and has injuries that the majority

considers worthy of concern. In either case, those comments evidence a new, unexplained and unfounded approach to jurisdiction.

The majority therefore, sadly, creates a new rule only for the class of claims and claimants it favors, rather than one that applies to all like-situated matters and litigants. Indeed, the proof of that may be found in the supremely ironic fact that, on the same date on which we heard oral argument in this appeal, we issued our unanimous opinion in *McKesson Corp. v. Hackensack Medical Imaging,* 197 *N.J.* 262, 962 *A.2d* 1076 (2009). The Court there, using language that the majority today echoes, commented that "[i]n today's rapidly shrinking world, the purchase of goods from out-of-state vendors has become commonplace." *Id.* at 278, 962 *A.2d* 1076. Contrary to the majority's conclusion that for some plaintiffs, that fact alone supports the exercise of jurisdiction, this Court in *McKesson* utilized our traditional due process approach, cautioning that "[t]hose instances, standing alone, are insufficient to establish the requisite minimum contacts needed to invoke long-arm jurisdiction consistent with due process." *Ibid.*

Second, the majority opinion includes a change in focus from an appropriate analysis of a defendant's due process rights to concerns that plaintiffs be assured of access to the most convenient forum. Particularly troubling in this regard is the end of the opinion, in which the majority appears to address two issues without benefit of briefing or argument. First, engaging in a discussion that should properly be characterized as a *forum non conveniens* analysis and, second, baldly asserting that our substantive law will apply, *ante* at 80, 987 *A.2d* at 593-94, the majority seeks to add support for its conclusion that defendant should be forced to defend itself here. Whether a dispassionate *forum non conveniens* or choice of law analysis would yield that result is of no consequence; the inclusion of those points, as if the outcome is self-evident, betrays a majority that has lost sight of the fact that the focus of the analysis of due process and jurisdiction should be on defendant.

Because the majority opinion is pervaded by expressions of concern for plaintiff, his particular cause of action, the severity of his injuries and his interests, and because it has shifted from fairness to the nonresident defendant as the "primary concern," *see World–Wide Volkswagen, supra,* 444 *U.S.* at 292, 100 *S.Ct.* at 564, 62 *L.Ed.*2d at 498, of a jurisdictional analysis, I respectfully dissent.

## IV.

The version of the stream of commerce theory that the majority uses is a radical departure from the articulations of that theory as embraced by this Court in *Gendler,* and by the opinions of the United States Supreme Court in *Asahi.* It shatters the traditional, constitutionally-required ties between jurisdiction and connection with the forum, instead concluding that the mere happenstance of a product finding its way here is sufficient indicia of foreseeability or availment or awareness which has long been the hallmark of due process. It avoids faithful application of the fundamental fairness concerns that have long guided this Court, and the United States Supreme Court, by relying on circular rhetoric about the global economy as if that alone comports with due process. In the end, the majority has replaced a carefully balanced test, albeit one with some slightly varying emphases, but that remained true to our notions of due process, with an unbounded one that presumes that participation in the global economy, without more, bespeaks purposeful availment of the benefits of this jurisdiction. I respectfully dissent.

Justice RIVERA–SOTO joins in this opinion.

Justice RIVERA–SOTO, dissenting.

In all respects, I wholeheartedly join in Justice Hoens's thoughtful, comprehensive and scholarly dissent. I write separately, however, solely to urge explicitly a point implied in Justice Hoens's dissent.

The majority's decision implicates and, in large and sweeping swaths, upends established notions of constitutional decision making that form the bedrock of our federal system. In so doing, it offends those core federalist concepts that rightly and prudentially limit the exercise of any one state's judicial power via the invocation of long-arm jurisprudence. It, therefore, cannot be allowed to stand. Because the majority "has decided an important federal question in a way that conflicts with" settled federal constitutional principles, *Sup.Ct. R.* 10(b), creates a new, insubstantial, and meaningless standard for the unbounded exercise of long-arm jurisdiction, and disturbs the careful balance that limits the exercise of judicial power between and among the several states, this decision is ripe for review and correction by the Supreme Court of the United States.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN and WALLACE—5.

*For reversal*—Justices RIVERA–SOTO and HOENS—2.